MARY DVORAK, APPELLEE, V. FRANK O. KUCERA: VICTOR A. DVORÁK ET AL., INTERVENERS, APPELLANTS.

FILED JANUARY 31, 1936. No. 29447.

*Bartos, Bartos & Placek,* for appellants.

*G. E. Hager, contra.*

Heard before Goss, C. J., Rose and Carter, JJ., and Redick and Kroger, District Judges.

Redick, District Judge.

This action was brought by Mary Dvorak, plaintiff and widow of Edward A. Dvorak, deceased, against Frank O. Kucera as an individual, praying for a judgment for the amount of the proceeds of a $10,000 life insurance policy issued upon the life of the said Edward A. Dvorak, deceased, and that said judgment be declared an equitable lien upon said proceeds. Certain creditors and heirs at law of said deceased obtained the permission of the court and intervened as parties defendant, as did also Frank O. Kucera as administrator of the estate of Edward A. Dvorak. The court, upon final hearing, dismissed the action against Kucera as an individual, and found for the plaintiff in the sum of $7,296.52 and interest, and the further sum of $800 and interest claimed to be due plaintiff's son Leonard Broz under a contract for his benefit with the plaintiff. The remaining interveners, the heirs of said deceased, and his creditors appeal.

The petition alleges that the plaintiff loaned her husband during his lifetime large sums of money, and about the year 1928 her husband orally assigned to her as collateral security the policy for $10,000 which was originally a term policy for ten years and later converted into an ordinary

life insurance policy, and that plaintiff had kept one or other of those policies in her possession ever since the same had been delivered to her, and claims an equitable lien on the proceeds of the policy which have been collected and are now in the hands of Kucera as administrator. The petition further alleges that plaintiff holds said policy as collateral security for $800 claimed as indebtedness from deceased to Leonard Broz. The allegations of the petition were put in issue by the answer.

The errors assigned are: (1) Findings of the court and judgment based thereon are not sustained by sufficient evidence. (2) Findings of the court and judgment are contrary to law. (3) The court erred in finding that the plaintiff held the insurance policy as collateral security for the $800 indebtedness to Leonard Broz. (4) That the court erred in refusing to admit the evidence of Frank Kovar. (5) That the court erred in rejecting the evidence of Charles Javorsky. (6) The court erred in admitting the testimony of Leonard Broz. Of these in their order:

1, 2. The testimony of plaintiff was properly excluded as to the transaction with her husband by which she claims to have received the policy as collateral security for his debt to her, but plaintiff testified she had loaned her husband September 1, 1926, the sum of $5,000, and a note for that amount was received in evidence, also a mortgage upon the Dvorak farm securing said note; also on June 9, 1932, the further sum of $670 and a note for that amount signed by her husband was received in evidence. This indebtedness is well established. Plaintiff testified that she had the policy in her possession since about 1928 (the original term policy was converted into the life policy in question in 1931), that she kept the insurance policy in question, together with policies of her own and other valuable papers tied up in a separate bundle, in a safe located in a closet in the farm house where she lived with her husband until March 5, 1932, when the house was partially destroyed by fire, after which, except for a few days in the garage, she kept the policy in question and these other papers in a tin

box under the brooder house until the damaged house was roofed over, when she kept them in the basement; that she retained the possession of the policy in question until after her husband's death by suicide on November 1, 1933, when Kucera, administrator, asked her for the policy for the purpose of making the proofs of loss, and that at first she refused, but afterwards delivered the policy to the administrator for the sole purpose of making the proofs and on the understanding that her debt was to be paid from the proceeds collected; that she kept the policy in a tin box and took it to Kucera's office when she delivered the policy to him; that Lambert took her to the home place in his car to get the tin box and she got it, and some clothes, and took it back to Kucera's. I told him I had all my important papers in the box. The mortgage securing the $5,000 note was not recorded, and later the plaintiff and her husband executed a mortgage to one Hoffman for the sum of $10,000, which was recorded and became a first lien upon the farm, and plaintiff testified on rebuttal that the policy in question came into her hands immediately after the Hoffman note and mortgage were executed, the date of which does not appear. Leonard Broz, son of plaintiff by a former marriage, testified that his mother kept her papers in the safe until after the fire, and then in a tin box which she kept under the brooder house, and after the basement was roofed over she kept it in the basement; that he was present at a conversation between his father and mother concerning a policy of insurance, that they were looking over the papers that were taken out of the safe and that "he gave the policy to mother and he said that will take the place of what amount of money that he owes her," and told her to keep it anywhere she wants to so it would not get lost. Irene Broz, daughter of plaintiff, testified that soon after the fire she was present on an occasion when her father and mother were sorting papers out of a box where they had put the papers that came out of the safe, and that Dad gave her the policy and "told her to keep it for the money that he owes her;" that her mother kept it in a tin box which she first

placed under the brooder house and then in the basement after it had been roofed over. Frank O. Kucera, called for plaintiff, testified that the day Dvorak committed suicide he took Mary to his house and the next day he asked Mary where she had those papers (exhibit 1) and "she had a safety deposit box, one of these little boxes they use in the bank," and the box and papers were there at my house; also that August, 1933, when Edward A. Dvorak was making application for a loan from the Federal Land Bank and listing his indebtedness he said, "Well, I owe her (his wife) quite a bit of money, but she is holding security, my life insurance policy," he says, "I don't think we have to put that in there." The application was not sent in as the other debts were more than the loan would stand. The above were all the witnesses called for plaintiff to establish the delivery of the policy, but plaintiff introduced in evidence a document in the handwriting of and signed by Edward A. Dvorak a short time before he killed himself by shooting in the head while plaintiff was kneeling beside him, and plaintiff testified that her husband gave her the paper and told her to keep it, and the paper was afterwards found by the side of the husband's body. It was identified as exhibit 1, and was in the following terms: "Loving Mary keep this Lambert Administrator 10,000 Insurance Pay 6000.00 to Loving Mary my wife all this I borrowed from her 800.00 to Leonard for leaving out high school and my gun automatic Give Mary her radio and car she payed for it also give her the pistol and kodak and every thing she wish I am sure she will treat you rite if you do her make her free so she can go and get well Save our farm pay Hoffman interest for 1933 and March 1934 pay Fritz Mrs Vrba Kores Oil Station Shimerda last Novak Z C B J will pay 500 to Edward and Lambert each on the 800 that I owe them. Lambert stay on home place sell Bullis Victor Lambert Edward divide when Edward is 21 Shimerda make every thing cheap give me my blue suit Dear Mary I know you will miss me but I will save you all Yours Loving Ed A Dvorak."

Opposed to this evidence for the plaintiff the interveners called three sons of the deceased by a former marriage, who testified in substance as follows: Lambert Dvorak testified that in 1933 his father told him, in answer to a question when he, the witness, would get his money, that he had insurance that would cover all his debts; that he never saw the tin box referred to by his step-mother; that he had a policy of insurance of his own which was kept with his father's policy in a wooden box under the bed or in a clothes closet. Victor Dvorak testified that after the fire the papers were taken from the safe and put in a wooden box; that about two months before his father died he had a conversation with his father and his mother was present, over money matters, in which his father said: " 'Everybody wants their money, and now your—and Mary wants her money and I can't give it to her—* * * even she wants me to sign over the policy that I have, she wants me to sign that policy over to her.' And he says, 'How can I do it?' He says, 'I have always been pretty proud around the people I have been living with, and these people loaned me the money with the intentions they are going to get it back some day.' And he says, 'I can't do it while—with these people around.' " That after his father's death, at a conversation in the office of Mr. Bartos about the appointment of an administrator, and also at the home of Frank O. Kucera, when the policy was discussed, his mother did not claim any interest in the policy. Edward Dvorak, Jr., testified that in the summer of 1933, when Mr. Ward was at the house, his father got the policy in question out of the lower drawer of a cupboard, together with policies of himself and brother Lambert, and put them back in the cupboard on the shelf, and that in June, 1933, he heard his father say that he had enough insurance to cover all debts. Defendants also offered in evidence deposition of H. M. Ward who testified that he was a life insurance salesman and was called to the house of Edward A. Dvorak the day before he died, October 31, 1933, by Edward, and that the policy was about to lapse for nonpayment of premiums,

and that he executed on behalf of the company an extension for 30 days; that Mary was present, and that her husband got the policy out of a drawer in a little bedroom; that at the time the term policy was converted to an ordinary life policy, in 1931, Mary was present and insisted that she be named as beneficiary in the new policy, but that her husband stated he wanted it made payable to his estate because it was to take care of indebtedness that he owed the estate, that he believed $10,000 would clean up the debts on the farm and leave the farm clear for the boys; that Mary said she should be beneficiary so she would be taken care of, but Edward said that the only reason he carried this policy was to take care of the indebtedness on the farm; that at that time Mary said nothing of any indebtedness to her; that at the time the policy was converted Edward A. Dvorak got the policy out of the safe.

On rebuttal Mary denied that her husband said to Victor in her presence that she wanted him to assign the policy, that she never asked him to assign it, and that what he did with reference to the policy was voluntary on his part. She also denied that the policy was produced and present at the time the extension agreement was made, but was in the basement. To recite all the evidence received would unnecessarily prolong this opinion, but the above is a résumé of the material parts.

Leonard Broz and Irene Broz were children of Mary Dvorak by a prior marriage, and Edward A. Dvorak, Jr., Lambert E. Dvorak and Victor A. Dvorak were children of the deceased. All of these people lived together on the Dvorak farm until the marriage of Victor in 1930. All the witnesses, therefore, except Kucera and Ward, were interested parties, and Ward was very intimate with Dvorak, Sr., described as a "crony," and they were in the habit of having drinking bouts together, Dvorak, Sr., especially, being a victim of excessive drinking, and was undoubtedly drunk at the time he committed suicide. It is extremely difficult for a reviewing court to arrive at a satisfactory conclusion when the testimony is in conflict and the princi-

pal fact to be determined rests upon the evidence of interested witnesses. In such case the judgment of the trial court who had the benefit of seeing the witnesses and observing their deportment while testifying is of considerable weight, notwithstanding the requirement of the statute that the reviewing court shall try the case *de novo*. This principle is well established in this jurisdiction by the case of *Johnson v. Erickson,* 110 Neb. 511, 194 N. W. 670, and many others that might be cited. In the instant case we have the positive testimony of plaintiff that the policy in question, or rather its predecessor, had been in her possession claiming it as collateral security since 1928, and the testimony of Leonard and Irene that after the fire the policy in question was, with other papers, taken out of the safe and delivered by Dvorak, Sr., to plaintiff, saying in substance that it would take the place of what he owed her, and the testimony of Kucera that upon the making of an application to the Federal Land Bank for a loan, Dvorak, Sr., stated that his wife was holding the policy as security for what he owed her. Opposing this, very naturally, there is no direct evidence, but the substance of what is offered is that on two or three occasions when the policy was under discussion Mary made no claim to any special interest in it, and Dvorak, Sr., stated that he carried this policy to take care of his debts; that on one or two occasions Dvorak had access to and produced the policy. The policy was payable "to the insured's executors or administrator, beneficiary." The testimony is in direct conflict as to where the policy was kept after the fire, plaintiff's witnesses stating it was kept in a tin box under the brooder house or in the basement of the farm house after it had been roofed over, while that of the interveners is in substance that it was kept in the drawer of a cupboard or clothes closet in a garage which had been converted into a dwelling after the fire and where the family thereafter lived. The testimony for interveners does not directly dispute that for plaintiff, but affords some inferences to cast doubt upon the evidence of the plaintiff, especially from the fact, if established, that Dvorak, Sr.,

produced the policy from a drawer or cupboard in a bedroom of the garage. But even this fact is far from conclusive as against plaintiff when the circumstances surrounding the parties are taken into consideration, that the question arises between husband and wife living together in a garage converted into a dwelling place, and where, in the nature of things, both of the parties would have access to the policy. The fact, under the circumstances, that Dvorak, Sr., produced the policy is not conclusive upon the question of possession. The right of possession is in the party having lawful claim upon the instrument and will not be defeated by the mere fact that another party might have such opportunity of access to it as to temporarily bring it within his custody. If, as we find, the weight of the evidence establishes that at some time, whether in 1928 or after the fire, the policy was delivered to plaintiff as collateral security, it constituted a pledge upon which to found an equitable lien upon the proceeds. See 37 C. J. 428, where it is said: "A policy may be pledged by delivery to secure a debt, although a formal assignment is not made, and either with or without a written transfer; or it may be assigned as collateral security." The provision of the policy that no assignment of the policy shall be binding upon the company unless in writing and filed with the company is for its benefit, and is not available to the administrator and interveners to defeat the lien of plaintiff upon the proceeds paid by the insurer. *Opitz v. Karel*, 118 Wis. 527, 95 N. W. 948; *Hogue v. Minnesota Packing & Provision Co.*, 59 Minn. 39, 60 N. W. 812. Upon a critical examination of all the evidence we are of opinion that the positive testimony of plaintiff's witnesses outweighs the inferences to be drawn from the evidence offered by interveners, and, giving due consideration to the fact that the trial court observed the witnesses and their manner of testifying, that the decree of the district court finding that the plaintiff has an equitable lien upon the proceeds of the insurance policy in question in the sum of $7,296.52, is correct.

3.  There is, however, no evidence to sustain the finding

of the district court that Leonard Broz has any equitable lien upon the proceeds of the policy. No testimony was offered to that effect and the decree in this respect seems to be based wholly upon the statement in exhibit 1, reading "800.00 to Leonard for leaving out high school." True, the preceding sentence in exhibit 1 reads "10,000 Insurance Pay 6000.00 to Loving Mary my wife all this I borrowed from her." The sentences quoted indicate at most a desire on the part of Dvorak, Sr., that payments from the insurance money be paid as indicated, but afford no just inferences that the policy had been theretofore held as security for such amounts. Of course, exhibit 1 is not enforceable as a will, and in the absence of any evidence that the policy was to be held as security for the amount admitted to be due Leonard, it can only be given effect as an admission of a debt payable out of the estate.

4, 5. Interveners claim that the court erred in refusing to receive the testimony of Frank Kovar to the effect that Dvorak stated that he had the policy changed to his estate so he could pay all his debts, and the testimony of Javorsky that Dvorak, Sr., stated that he had insurance to cover all his debts. Mary was not present when either of these statements was made and we think they were properly excluded as incompetent and hearsay. The evidence offered was in the nature of admissions, but such are ordinarily received only when against the interest of the party making them, not as evidence in his favor. The interest of the administrator, heirs and creditors of the estate is adverse to that of plaintiff and the evidence was not competent as against the plaintiff. But beyond this, in our judgment, they had no tendency to refute the claim of the plaintiff that the policy had been delivered to her as security.

6. That the court erred in admitting the testimony of Leonard Broz because witness was interested at least to the extent of his claim of $800. It is claimed that the witness was incompetent under section 20-1202, Comp. St. 1929, providing: "No person having a direct legal interest in the result of any civil action or proceeding, when the adverse

party is the representative of a deceased person, shall be permitted to testify to any transaction or conversation had between the deceased person and the witness." The point is not well taken, as the evidence was not of any transaction between the witness and the deceased, but of a conversation between the deceased and his wife, which the witness overheard and in which the evidence does not show he took any part. Under such circumstances the witness was not incompetent under the statute. *Hajek v. Hajek,* 108 Neb. 503, 188 N. W. 181; *McNea v. Moran,* 101 Neb. 476, 163 N. W. 766; *In re Estate of Powers,* 79 Neb. 680, 113 N. W. 198; *Kroh v. Heins,* 48 Neb. 691, 67 N. W. 771; *DeWulf v. DeWulf,* 104 Neb. 105, 175 N. W. 884.

We conclude that the judgment in favor of plaintiff for $7,296.52 with interest is correct and should be affirmed; that the district court erred in its finding and judgment in favor of Leonard Broz, and to that extent the judgment should be reversed and action dismissed; and it is so ordered accordingly.

AFFIRMED IN PART AND REVERSED IN PART.